IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JERRY L. MARTINEZ,

        Plaintiff,

vs.                                    No. CIV 08-819 LFG

MICHAEL J. ASTRUE, Commissioner
of the Social Security Administration,

        Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff  Jerry L. Martinez ("Martinez") invokes this Court's jurisdiction under 42 U.S.C.

§ 405(g) seeking judicial review of a final decision of the Commissioner of Social Security

("Commissioner").   The Commissioner determined that Martinez is not eligible for disability

insurance benefits ("DIB").  Martinez moves this Court for an order reversing the Commissioner's

final decision and remanding for a rehearing. [Doc. 10].

## Factual and Procedural Background

Martinez was born on September 4, 1953 and was 53 years old at the time of the

administrative hearing. [Tr. 52].  Martinez has been married for over 30 years and has two sons. [Tr.

52, 252, 264].  He graduated from high school in 1972 and enlisted in the U.S. Marine Corps that

year.  He later took community college classes while he was in the National Guard and completed

an A.A. degree in general studies. [Tr. 220, 262].

Martinez served in the Marine Corps for four years on active duty and later returned to the

military, serving in the Army Reserve and Army National Guard at various times from 1982 to 2001.

[Tr. 52, 112, 124].  He retired from the military in 2001. [Tr. 262].  From September 1997 to May

1998 Martinez worked as a school security officer, and from December 2001 until his resignation effective September 10, 2004, he worked as a deputy sheriff. [Tr. 94].  While in the military, Martinez worked in logistics, coordinating supplies, procurement and contracting requirements for a battalion-sized unit. [Tr. 96].

Martinez suffered a back injury in 1998 while on active duty.  After a training session, he began to have some numbness and was found to have disc problems in his back and neck. [Tr. 252]. He received treatment for this condition over the years, as described below, but never had surgery.

Martinez received service-connected compensation from the VA for his back condition, and later for symptoms of depression.  On August 10, 2004, Martinez was notified that his claim for increase in compensation was granted.  [Tr. 112-115].  He was given a 30% rating for major depressive disorder which "as likely as not [is] related to your service-connected disability for your back condition." [Tr. 113].   The 20% rating for degenerative disc disease of the lumbosacral spine, and 20% for the cervical spine, was continued, for a total of disability rating of 70%.

Martinez resigned from his position as a deputy sheriff effective September 10, 2004, citing his military service-connected disabilities and stating, "I feel that I am no longer able to function properly in my job duties."  [Tr. 88].

On September 15, 2004, he filed a claim for an increase in his service-connected compensation.  [Tr. 89-93].  On October 6, 2004, Martinez received notice that his claim for increase in service-connected compensation was granted by the VA.  He was awarded a 100% disability rating, based on "individual unemployability."  [Tr. 89].

On October 12, 2004, Martinez applied for Social Security DIB, alleging an onset date of September 10, 2004.  He contends that he is unable to work due to cervical spine impairments, post traumatic stress disorder ("PTSD"), and depression. [Tr. 52, 107; Doc. 10, at 2-3].  His claim for

benefits was denied on January 10, 2005, and his request for reconsideration was turned down on March 30, 2005. [Tr. 38-40, 43-45]. He requested a hearing with an Administrative Law Judge ("ALJ"), which was held on November 29, 2006. [Tr. 274-306]. The ALJ rendered her decision in an opinion dated October 22, 2007, denying Martinez's claim. [Tr. 16-29].

Martinez then requested review by the Appeals Council and submitted new evidence for the Council's review, consisting of the report of a consultative examination by psychologist Robert Krueger, Ph.D., which was conducted after the ALJ's decision was entered. The report includes Dr. Krueger's mental Residual Functional Capacity ("RFC") Assessment. [Tr. 256-259, 261-273]. The Appeals Council denied Martinez's request for review on August 27, 2008. In its Notice, the Council stated that in looking at the case it had reviewed the additional evidence submitted with the request for review, including Dr. Krueger's report and RFC assessment. The Council did not analyze or discuss this new evidence. [Tr. 7-10].

This appeal followed.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[1] The burden rests upon the claimant throughout the first four steps of this process to prove disability, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five. If at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[2]

---

[1]20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (2008); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[2]20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (2008); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

Briefly, the steps are: at step one, claimant must prove he is not currently engaged in substantial gainful activity;[3] at step two, the claimant must prove his impairment is "severe" in that it "significantly limits [his] physical or mental ability to do basic work activities . . . .;"[4] at step three, the Commissioner must conclude the claimant is disabled if he proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (2008);[5] and, at step four, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his past relevant work.[6]

If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[7] age, education and past work experience, he is capable of performing other work.[8] If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove he cannot, in fact, perform that work.[9] In the case at bar, the ALJ made the dispositive determination of non-disability at step four the sequential evaluation, finding that Martinez can return to his past relevant work as a supply clerk. [Tr. 29].

---

[3]20 C.F.R. §§ 404.1520(b), 416.920(b) (2008).

[4]20 C.F.R. §§ 404.1520(c), 416.920(c) (2008).

[5]20 C.F.R. §§ 404.1520(d), 416.920(d) (2008). If a claimant's impairment meets certain criteria, that means his impairments are "severe enough to prevent [her] from doing any gainful activity." 20 C.F.R. §§ 404.1525(a), 416.925(a) (2008).

[6]20 C.F.R. §§ 404.1520(e),(f) 416.920(e),(f) (2008).

[7]The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy. Those categories are: sedentary, light, medium, heavy and very heavy. 20 C.F.R. §§ 404.1567, 416.967 (2008).

[8]20 C.F.R. §§ 404.1520(g), 416.920(g) (2008).

[9]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

Martinez contends that the final administrative decision is not supported by substantial evidence, that the Commissioner did not carry his burden of proof, and that the Commissioner did not apply the correct legal standards.

### Standard of Review and Allegations of Error

On appeal, the Court's review of the Commissioner's determination is limited. Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992). The Court's function is to consider whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Glenn v. Shalala, 21 F.3d 983 (10th Cir. 1994). To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992).

In Clifton v. Chater, 79 F.3d 1007, 1009-10 (10th Cir. 1996), the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must also discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects. (citations omitted).

If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed. The Court can neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

In this case, the ALJ found that Martinez is not disabled under the standards of the Social Security Act. In reaching this decision, the ALJ found that Martinez has severe impairments of diabetes mellitus, degenerative disc disease of the cervical and lumbar spine, and mood disorders,

but that none of the impairments or any combination thereof meet the Listings.  She found further that Martinez has the RFC to perform the full exertional range of light work and is capable of understanding, remembering and carrying out moderately detailed instructions and tasks in object-focused work that is relatively routine in nature. [Tr. 21-25].  The ALJ then concluded that Martinez is capable of performing his past relevant work as a supply clerk and therefore is not under a disability as defined in the Social Security Act. [Tr. 29].

Martinez claims the Commissioner erred in failing to consider or discuss the report of Dr. Krueger, submitted as additional material after the ALJ hearing.  He claims further that the ALJ erred in failing to give sufficient weight to Martinez's VA disability rating of 100%, erred in evaluation of the psychiatric evidence, erred in failing to give sufficient weight to the statements of Martinez's wife and brother, and made a faulty RFC assessment which was not supported by the evidence.  The Commissioner disputes these contentions, arguing that the ALJ applied proper legal standards and that her decision is supported by substantial evidence.

## Discussion

### *Summary of Martinez's Medical Conditions and Treatment*

The record indicates that Martinez suffers from disc herniation and related conditions in the cervical and lumbar spine, as well as diabetes.  Martinez's appeal, however, focuses primarily on his psychological impairments.  In his Motion to Remand, Martinez states:

> Plaintiff suffers from the orthopedic problems with pain and the psychological reaction to it and Post Traumatic Stress Syndrome Disorder . . . .  Plaintiff concedes that the physical problems by themselves are not disabling, but it is the effects of the psychological reaction to the injuries and PTSD that are at issue here . . . .

[Doc. 10, at 2].

6

A. *Physical Impairments and Treatments Therefor*

The record indicates that Martinez was seen at the VA Medical Center in Cleveland, Ohio over a period of several months in 1999 while he was on active duty in the military. In February of that year, he presented complaining of leg spasticity and pain. An MRI of the spine on February 17, 1999 and another on March 1, 1999, showed a large left-sided disc herniation at the C6-C7 level, with spinal cord compression and stenosis (narrowing). [Tr. 140-141].

Martinez was admitted overnight to the VA hospital in Cleveland on March 9, 1999. A neurosurgical consult was obtained, and Martinez was scheduled for surgery on March 18. At that time, he had no significant medical history, no previous hospital admissions and was not taking any medications. Further radiologic tests confirmed the C6-C7 herniation and also showed mild to moderate disc bulging at C5-C6. [Tr. 142-147]. Martinez was seen at the Cleveland Clinic Foundation on March 15, 1999. The doctor there agreed with Martinez's physician that he should have surgery on his neck involving a discectomy and fusion, and perhaps a second operation later on his lower back to relieve the nerve compression and leg symptoms. [Tr. 157].

Martinez decided not to have the neck surgery. [Tr. 192]. His wife later wrote, in a letter in support of his claim for Social Security benefits, that this decision was based on Martinez's fear that he would be given a physical disability discharge from the Army, rather than a regular military retirement. Since he needed only two more years to retire, he decided to continue his military career and seek help from a chiropractor, which seemed to relieve his symptoms temporarily. [Tr. 127].

Instead of surgery, Martinez received physical therapy treatments from August 9 to October 1, 1999, which resulted in minimal improvement. [Tr. 132-139, 149-150]. MRIs of the cervical and lumbar spine, taken October 6, 1999, showed that the findings of March 1999 were grossly unchanged with respect to the cervical spine, and that there was some disc bulging as well at the L5-

7

S1 and L4-L5 levels.  [Tr. 149-150].

By March 2002, Martinez was retired from the military and had moved to Santa Fe.  He was followed by Dr. Martha K. Dummer, M.D. at the VA Santa Fe Clinic.  In March 2002, Martinez's lab tests indicated borderline diabetes. [Tr. 159, 161].  By September 26, 2003, he reported to Dr. Dummer that he had been going to a chiropractor for his back problems and that this helped more than medication, which he took only about once a week, when the pain was severe.  [Tr. 192].  By this time, Martinez had been awarded a 30% disability by the VA for the herniated discs in his back and neck.  [Id.].

Martinez continued to see a chiropractor from December 2003 to December 2006. [Tr. 251]. The chiropractor reported that Martinez obtained pain relief from the adjustments but that the positive results would last only a short time until the pain symptoms returned. [Tr. 212].

At the September 2003 visit, and again on January 27, 2004, the doctor noted that Martinez's diabetes was under good control with medication [Tr. 194].  On January 30, 2004, Martinez presented with complaints of sudden hearing loss and was placed on a high dose of prednisone. [Tr. 178-182].  This caused an elevation in his blood sugar levels, and Dr. Dummer increased his diabetes medication. [Tr. 180].  By May 7, 2004, Dr. Dummer reported that his diabetes was again in good control with medication. [Tr. 175].  He continued to have somewhat elevated blood glucose levels in visits of July and November of 2004 and in also in January 2005. [Tr. 171-172, 205-206, 202-203].

B.  *Psychological Impairments and Treatments Therefor*

As noted above, Martinez resigned from his job as a deputy sheriff effective September 10, 2004.  He filed his application for Social Security disability benefits on October 12, 2004, giving his onset date as September 10, 2004. [Tr. 52-57].

As of September 26, 2003, Martinez told his Dr. Dummer that he had not experienced any feelings of depression or hopelessness in the previous month, nor of any loss of pleasure in his activities.  [Tr. 195].  However, on May 7, 2004, Martinez told a nurse at a routine visit that he was "currently being followed for treatment of depression." [Tr. 177].

Two psychotherapy sessions with Teresa J. Graber, LCSW, are noted in the record.  At the first of these sessions, a self-referral on June 1, 2004, Ms. Graber made a diagnosis of adjustment reaction with mixed mood, related to his health concerns and psychosocial stressors.  Martinez told Ms. Graber that the stress was caused by his health problems, particularly the incompletely controlled diabetes and spinal problems in the neck and lower back.  Martinez stated that since the holidays, presumably meaning for the first half of 2004, he had been experiencing some related symptoms of depression and anxiety.  These symptoms included depressed mood, sleep problems, irritability, isolation, decrease in interest, impaired motivation and inability to complete tasks.  He said further that he had withdrawn from his extended family and friends and that, aside from his activities with the Vietnam Veterans of America and its color guard, he had little contact outside his immediate family. The counselor noted that he had a good marriage and family support system but had withdrawn from social interactions.  [Tr. 163-165].

Martinez also told Ms. Graber at this visit that he did not have a history of depression, that he had no previous history of treatment or intervention for psychiatric problems, and that the onset of his psychological problems occurred approximately six months earlier.  Ms. Graber concluded that, in the event his symptoms did not decrease within the next month, he was a candidate for antidepressants.  She planned a series of approximately eight one-on-one therapy sessions. [Tr. 164-165].

The record indicates only one further visit with Ms. Graber, on June 21, 2004.  At this time,

Martinez was reporting a decrease in his symptoms of depression with improved mood, outlook and coping, although he said he was still suffering from sleep disturbances.  He attributed his relief to the initial therapy session, along with his "processing of the issues." [Tr. 163].  He also discussed his efforts to exercise and control his diabetes, the fact that he attends church frequently for support, and "positive coping with life situations." [Id.].  The therapist also mentioned "processing around resentments toward Govt re: his benefits, retirement and SC [service-connected benefits]." [Id.].  They agreed to follow up with another one-on-one session in one month and discussed the fact that a trial of antidepressants may not be necessary, given the improvement in symptoms.

There is no record of any further appointments with Ms. Graber, nor is there any indication that Martinez sought out any other help for mental health concerns.

On June 24, 2004, Martinez was seen at the Albuquerque VA Medical Center for a Compensation and Pension Exam Report.  [Tr. 253-255]. The examining health care provider is listed as Cheryl Greene, but her education and credentials are not listed.[10]  Ms. Greene noted that Martinez was there for his first Psychiatric Compensation and Pension exam, and that he was claiming a service-connected disability for depression secondary to his back condition.

At the exam, Martinez complained of sleep problems, hypervigilance and increased startle response but without paranoia, hallucinations or flashbacks.  He also complained of concentration and memory problems over the past five years, and depression without crying but with occasional suicidal ideation related to his physical problems and lack of functioning.  He said he suffered from

_____

[10]The Commissioner refers to Cheryl Greene as "Dr. Greene," even though there is nothing on the record to indicate Ms. Greene's education or professional qualifications.  The ALJ noted her assumption that Cheryl Greene is a clinical psychologist or psychiatrist because that would be consistent with VA policy.  While it is a reasonable assumption that this provider can legitimately be referred to as a "doctor," the record is actually silent on this point; thus, Cheryl Greene will be referred to herein as "Ms. Greene."

anxiety but did not report any panic attacks or shaky spells.  He said the above symptoms appeared over the past five years and were all related to worrying about his physical problems. [Tr. 253].

Martinez also reported temper and anger problems over the past five years, stating he is "more of a loner now," has no close friends and no social life, and does not like crowds.  He also reported positive homicidal ideation.  [Id.].  However, he told Ms. Greene that he tried to exercise regularly to help with the diabetes, and that his activities included attending church three times a week, serving in the Vietnam Veterans' color guard, and helping take care of his elderly father. He stated that he had seen a social worker twice and planned to continue to see her once a month. [Tr. 254].

Martinez also told Ms. Greene that he was never wounded during his service in the military. He was stationed offshore in Vietnam for two days but was not in any combat.  He never dealt with the dead or wounded, except once at Camp LeJeune when he found a dead body on the base. [Tr. 254].

Ms. Greene noted that Martinez was nicely dressed and groomed, behaved appropriately, and was cooperative with the examination.  She found his mood to be depressed and anxious, although his speech was coherent, thought processes were linear, and there was no evidence of psychosis. No suicidal, homicidal or paranoid ideation was evident.  He had good memory and recall, his cognitive function was grossly intact, and his insight and judgment appeared good.

Ms. Greene diagnosed Martinez with major depressive disorder.  She noted further that although Martinez reported no periods of remission of the depression since it started, he was nevertheless able to maintain his personal hygiene and other basic activities of daily living. [Tr. 254-255].  She concluded that "this veteran's depression is as likely as not related to his service-connected disability for his back condition."  [Tr. 255].

11

As noted above, Martinez resigned from his employment as a deputy sheriff effective September 10, 2004 and soon thereafter, on October 6, 2004, he received notice from the VA that it considered him to be 100% disabled, the VA noting that "[s]ervice connection for major depressive disorder has been established as related to the service-connected disability of degenerative disc disease of the lumbo-sacral spine." [Tr. 93]. This conclusion was based primarily on Ms. Greene's report. [Id.].

Martinez filed his application for Social Security benefits on October 12, 2004. On December 16, 2004, he underwent a consultative examination with Michael Gzaskow, M.D., a board-certified psychiatrist. [Tr. 219-222]. Martinez submitted two letters to Dr. Gzaskow, each dated May 20, 2004, written by Martinez's brother and wife. These letters had previously been submitted to the VA in connection with Martinez's request for an increase in benefits. Dr. Gzaskow described these letters as "excellent data" [Tr. 219] which indicated that Martinez has suffered from depression over the years, secondary to his chronic orthopedic problems.

In her letter, Martinez's wife Teresa D. Martinez stated that they had been married for 26 years and that over the past several years, she had noticed many emotional changes in her husband, all related to his diabetes or disc problems. She said her husband used to be an active person but now tends to doze off if he sits in one place for awhile. In addition, she said, he has become very isolated, doesn't associate with family and friends as much as he did in the past and doesn't like to go to crowded places. He becomes very angry over small things and sometimes forgets who people are. [Tr. 86-87].

Martinez's brother, Domingo P. Martinez, wrote in his letter that his brother used to be very active in organizations and activities at school and home, playing sports and helping out with his sons's sports activities. He was popular and outgoing in his younger years, enjoyed having many

friends, and participated actively in numerous organizations where he took on leadership roles.  But "[t]oday Jerry is another person."  He says that his brother is always in pain, looking for methods of relief, is irritable and cannot sit still for long.  He "resorts to staying at home" and spends only minimal time with the extended family.  Mr. Martinez also reports that his brother has memory lapses and many times does not remember old friends, relatives, dates and events from their past. [Tr. 85].

Dr. Gzaskow noted that Martinez had never received inpatient psychiatric care and had received outpatient care on only two occasions in the past.  At the exam, Martinez was well dressed and appeared alert and cooperative.  His mood was slightly depressed with a sad and flattened affect. His speech was logical and there was no evidence of any organic or psychotic thought pathology, nor of any hallucinations or delusions.  He told the doctor that he could walk away from conflict and had learned to manage anger issues through his years in the military.  He denied any suicidal history, past or present.  He was oriented in all spheres with no deficits in immediate recall nor in recent or remote memory.  Calculations and abstractions were intact, his general intellectual functioning and general fund of knowledge were average, and his insight and judgment were good. [Tr. 221].

Dr. Gzaskow's diagnosis was major depressive disorder, chronic/recurrent, mood disorder secondary to chronic orthopedic issues with pain, and "posttraumatic stress disorder (PTSD) (by history)." [Tr. 221].  Under a section labeled "Capability," he wrote that Martinez has a difficult time relating to others based on his psychological reactions to chronic pain syndrome but that he can understand and follow directions in a structured/supportive environment and can attend to simple tasks.  If granted disability benefits, he would have the ability to manage his own funds.  He also noted that Martinez stated he could no longer withstand the stress and pressures associated with day-to-day work activity. [Tr. 222].

On January 10, 2005, approximately one month after Dr. Gzaskow's consultative exam, Martinez's claim for Social Security disability benefits was denied.  There is nothing on the record to indicate that Martinez obtained any further psychological counseling after his June 21, 2004 visit with Ms. Graber.  The examination by Cheryl Greene on June 24, 2004 was conducted for purposes of evaluation for VA benefits, the examination by Dr. Gzaskow on December 16, 2004 was a consultative exam to help determine eligibility for Social Security benefits, and the examination by Dr. Krueger on October 25, 2007 was conducted for the purpose of providing evidence to the Appeals Council after the ALJ rendered the decision denying benefits.  None of these providers can therefore be considered as "treating" physicians or health care providers.  20 C.F.R. § 404.1502 (2008); Doyal v. Barnhart, 331 F.3d 758, 762-63 (10th Cir. 2003) ("a longstanding treatment relationship provides some assurance that the opinion has been formed for purposes of treatment and not simply to facilitate the obtaining of benefits . . . . [T]he opinion of an examining physician who only saw the claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion.").

### *Claimant's Points I and III:*
*Consideration of Dr. Krueger's Report and Whether the ALJ's*
*Assessment of the Psychiatric Evidence is Supported by the Record*

The ALJ issued her decision denying benefits on October 22, 2007.  Shortly thereafter, on October 25, 2007, Martinez was referred by his attorney to Robert Krueger, Ph.D., a board-certified psychologist, for a consultative examination.  As noted above, Dr. Krueger's report and RFC assessment were submitted to the Commissioner for consideration at the Appeals Council level. [Tr. 256].

The Appeals Council did not discuss or analyze Dr. Krueger's report in its notice of unfavorable ruling; however, the Council stated that, "[i]n looking at your case, we considered the

14

reasons you disagree with the decision and the additional evidence listed on the enclosed Order of the Appeals Council."  [Tr. 7].  The enclosed order noted that the Council received additional evidence and made it part of the record, specifically listing the "Report of Psychological Evaluation dated 10/27/07 & 'Residual Functional Capacity Assessment' dated 10/29/07." [Tr. 10].  These were Dr. Krueger's reports.

A claimant may submit additional material after the ALJ decision is entered.  Such evidence becomes part of the record for purposes of review by the Appeals Council and, if the case proceeds to District Court, for purposes of evaluating the Commissioner's decision for substantial evidence.  20 C.F.R. 404.970(b) (2008); O'Dell v. Shalala, 44 F.3d 855 (10th Cir. 1994).  When such additional material is submitted, the Commissioner's final decision "necessarily includes the Appeals Council's conclusion that the ALJ's finding remained correct despite the new evidence."  O'Dell, at 859.

While it would be helpful to the reviewing court to have a statement of the reasons why the Appeals Council did not find the additional material persuasive, the Court is required "to consider the new evidence to determine whether it outweighs the evidence that was before the ALJ when he made his decision, without regard to the absence of any agency analysis of that evidence."  Stephens v. Callahan, 971 F. Supp. 1388, 1391 (N. D. Okla. 1997).  The Stephens court pointed out (although noting the point with disapproval) that the Appeals Council is not required by any regulation to discuss or analyze the new evidence.   It is only if the Appeals Council entirely fails to consider qualifying new evidence that the case should be remanded for further proceedings.  Chambers v. Barnhart, 389 F.3d 1139, 1143 (10th Cir. 2004).

Here, the Appeals Council specifically notified Martinez that it had considered Dr. Krueger's report but nevertheless found that the ALJ's decision was supported by substantial evidence.  The

Court therefore rejects Claimant's assertions that "[o]n review by the Appeals Council, the Agency's errors were compounded by the failure to mention the supplemental psychological report" and that "no consideration was given [by the Appeals Council] to Dr. Krueger's psychological evaluation." [Doc. 10, at 3-4; Doc. 14, at 2].

The Court further rejects the implication that Dr. Krueger's report was conclusive on the issue of a psychological disability or outweighs most of the other evidence in the record.

Martinez asserts, first, that Dr. Krueger's report confirms the earlier evaluation of Dr. Gzaskow, the psychiatrist who submitted a consultative report on December 29, 2004, in that both physicians found that Martinez suffered from Major Depressive Disorder, as well as PTSD.  He also argues that Dr. Krueger's evaluation is entitled to greater weight than that of other examining doctors, because he is the only one who administered psychological tests.  Martinez further contends that Dr. Krueger's findings erode the ALJ's conclusion that there was no impairment of concentration, in that he found that Martinez suffers marked limits in his ability to complete a normal workday and workweek without interruptions from psychological symptoms, to perform at a consistent pace without an unreasonable number of rest periods, and to maintain attention and concentration for extended periods.

Martinez argues that the Appeals Council should have given strong weight to Dr. Krueger's report because it shows progressive deterioration over time, it concurs in the more severe limitations as stated by Dr. Gzaskow rather than the less severe limitations drawn from Ms. Greene's report, and it "provides a necessary assessment of Plaintiff's condition in view of the excessive 11 months it took for the ALJ to issue her unfavorable decision." [Doc. 10, at 5].

The Commissioner argues that Dr. Krueger's report is not entitled to any greater weight than are the reports of Ms. Greene and Dr. Gzaskow since Dr. Krueger's evaluation, like those of the

other two medical providers, was done for the purpose of assessing whether Martinez was eligible for benefits, rather than for the purpose of providing treatment for psychological problems.

The Commissioner contends that Dr. Krueger's report does not undermine the sufficiency of the evidence supporting the ALJ's decision, for the following reasons: Dr. Krueger appears to have simply accepted statements by Martinez that his VA disability rating was combat-related, whereas Martinez told Ms. Greene that he did not experience combat; Martinez told Dr. Krueger about several violent, near-death experiences during his employment as a prison guard and law enforcement officers, including his presence at the New Mexico penitentiary following the infamous prison riot of 1980, a shootout with prison escapees, and the death of a partner, but he never mentioned these incidents in previous interviews with mental health care providers; Martinez acknowledged his participation in a wide range of activities, including involvement with his church and the color guard, exercising, housekeeping, taking care of his elderly father and helping out with his three grandchildren on a regular basis, all of which undermine the doctor's finding of a concentration deficiency; and, finally, because Dr. Krueger's report conflicts with other evidence of record.

Dr. Krueger's evaluation was based on a clinical interview with Martinez, including a psychosocial history and mental status exam, and the results of two psychological tests (three tests were administered, but Dr. Krueger found that one test result was of "questionable validity").  In the interview, Martinez stated that 20% of his VA disability is "combat-related" [Tr. 262]; however, elsewhere in the record, Martinez told mental health care examiners that he was not involved in any combat during his service in the military [Tr. 165, 254]; indeed, this is the only reference to combat in the entire record.

In his two meetings with Ms. Graber, his only treating mental health care counselor,

17

Martinez attributed his depression to problems with his health.  He did not describe to her any traumatic incidents while in the military or while serving as a law enforcement officer, nor did he claim to have PTSD.  At the session with Ms. Graber on June 1, 2004, Martinez reported he was stressed by his health problems, which included spinal issues and diabetes. He said he was stationed offshore in Vietnam in 1974 and that he requested a tour of duty in Vietnam but was unsuccessful. In her Assessment, Ms. Graber diagnosed Martinez with adjustment reaction with mixed mood, secondary to health concerns, difficulties controlling diabetes, and spinal pain. [Tr. 164].  She did not mention PTSD.

In notes of the VA examination conducted on July 14, 2004, Ms. Greene stated that Martinez was claiming "a service-connected disability for depression secondary to his service-connected disability for his back condition." [Tr. 253].  She noted further that Martinez said he experienced occasional thoughts of suicide "which he relates to his physical problems with loss of functioning." [Id.].  He also complained to her of anxiety "mainly because of worrying about his physical problems." [Id.].   During the examination, Martinez did not describe any traumatic events experienced in the military or on the job.  He told Ms. Greene that he was stationed offshore in Vietnam for two days but was not in any combat and was never wounded.  Her assessment was that Martinez suffered from major depressive disorder, along with psychosocial and environmental stressors. [Tr. 254].  She concluded that his depression "is as likely as not related to his service-connected disability for his back condition . . . ." [Tr. 255].  She did not mention PTSD.

In his notes of the consultative examination of December 16, 2004, Dr. Gzaskow referred to the letters submitted by Martinez's wife and brother, stating that the letters indicate that his depression is "secondary to his chronic orthopedic problems." [Tr. 219].  Martinez answered Dr. Gzaskow's questions about his military service and employment experience but did not mention any

traumatic or violent events, nor did he attribute his depression to such events.  Dr. Gzaskow diagnosed major depressive disorder, chronic/recurrent, mood disorder "secondary to general medical conditions (chronic orthopedic issues with pain),"and "PTSD (by history)."  [Tr. 221].

Dr. Gzaskow found that Martinez "has a difficult time relating to others, based on his psychological reaction to chronic pain syndrome." [Tr. 222].  He further found that Martinez can understand and follow directions in a structured/supportive environment and can attend to simple tasks.  He also noted Martinez's statement that he can no longer withstand the stress and pressures of daily work activity due to his psychological problems. [Tr. 222].

While Dr. Krueger included a diagnosis of PTSD in his assessment, Martinez's statements to Dr. Krueger stand in contrast to his earlier statements to Ms. Graber, Ms. Greene, and Dr. Gzaskow about the reasons for his depression.

Dr. Krueger's diagnosis of PTSD was based in part on Martinez's statement that 20% of his VA disability was "combat-related," and because Martinez "described a variety of traumatic incidents while he was in the military, and it appears that he was exposed to even more traumatic events while he was working as a law enforcement officer." [Tr. 266].  Martinez told him, "I had close calls with death." [Tr. 263].  He said that he was once "almost overwhelmed" by a group of prisoners who wanted to assault an inmate he was transporting, that he was engaged in a shootout with eleven escapees and "came close to being shot," that he witnessed various atrocities committed by inmates during the 1980 Santa Fe prison riot, and that a close friend and partner of his was killed. [Tr. 263].

None of these incidents was reported to any other mental health care examiner or provider, nor did Martinez ever cite these incidents as a reason for his depression, prior to the interview with Dr. Krueger.  Rather, he consistently related his depression to his health problems, primarily pain

from his spinal condition and difficulty keeping his diabetes under control.

Dr. Krueger noted that Martinez's description of his emotional and behavioral problems are "strongly suggestive of having post-traumatic stress disorder," including Martinez's statement that his serious emotional difficulties began when his partner was killed and when he experienced the shootouts and the state pen riot, his statements that he has some history of nightmares and disturbing memories, and his reports of a tendency toward hypervigilance and loss of temper. [Tr. 263-264].

Martinez's statement that the depression began with the 1980 prison riot is not reflected anywhere else on the record, and it directly contradicts his statement to Ms. Graber in June 2004 that the onset of his psychological problems occurred approximately six months earlier and was related to his physical problems rather than to past traumatic experiences [Tr. 164], and his statement to Dr. Dummer in September 2003 that he was not experiencing any symptoms of depression. [Tr. 195].

The conclusion that Dr. Krueger's evaluation does not significantly undermine the ALJ's decision is also supported by record evidence that Martinez attended only two psychotherapy sessions even though mental health counseling was available to him through the VA, that he was never prescribed any antidepressant medication, and that he described a wide variety of activities including active church attendance, participation with the color guard, regular exercise, and caregiving for his father and grandchildren.

Martinez also argues that Dr. Krueger's assessment of cognitive deficits undermines the ALJ's decision.  Dr. Krueger noted that Martinez generally displayed good verbal skills and did not report any previous history of learning disabilities, but that he reported ongoing problems with concentration and memory.  Results of tests administered by Dr. Krueger "suggest that he does have moderate impairment with concentration and working memory skills." [Tr. 265].  Dr. Krueger concluded that "[b]ecause of problems with concentration and memory, he may have mild to

moderate impairment with understanding, remembering, and following simple work instructions, and perhaps moderate to severe impairment with complex or detailed instructions." [Tr. 267].  He also found that Martinez is likely to have moderate difficulty in maintaining pace and persistence in many work environments. [Id.].

These conclusions contrast with the assessments of other examining and treating mental health care providers.  Ms. Graber noted that although Martinez described himself as having impaired motivation and impaired ability to complete tasks, she found him to be "motivated and goal oriented" with respect to his treatment.  [Tr. 164, 165].

Ms. Greene noted Martinez's statements that he has temper and anger management problems and has become more irritable over the last five years, that he "is a loner now" and has no social life, and that he experienced concentration and memory problems for the past five years. [Tr. 252].  In spite of these complaints, however, and in spite of Ms. Greene's finding that he demonstrated a depressed and anxious mood, she also found that he was oriented intellectually, had good memory and recall, his cognitive function was grossly intact, and his insight and judgment appeared good. [Tr. 254].

Dr. Gzaskow found, on mental status exam, that Martinez was oriented in all spheres with no deficits in immediate recall or in recent or remote memory, that his calculations and abstractions were intact, that his general intellectual function and fund of knowledge were average, and that his insight and judgment were good. [Tr. 221].  He concluded that Martinez can understand and follow directions in a structured/supportive environment and can attend to simple tasks. [Tr. 222].

The ALJ relied on these reports to find that Martinez is "capable of understanding, remembering and carrying out moderately detailed instructions and tasks in object-focused work that is relatively routine in nature" [Tr. 25], and this assessment was part of the hypothetical which she

posed to the VE at the administrative hearing. [Tr. 298].

This finding is also supported by Martinez's statements that he does the household shopping and manages his own bill paying and other financial matters, enjoys watching television and reading, [Tr. 105-106], is "completely involved" in activities at his church, community center and Veterans' Center [Tr. 106] and that, although his condition affects his memory and concentration, it does not affect his ability to complete tasks, understand, follow instructions, or to finish what he starts (*e.g.*, chores, reading or watching a movie). [Tr. 107].  In addition, Martinez told the ALJ at the administrative hearing that he helps his elderly father with financial matters [Tr. 292] and that he cares for his grandchildren on a regular basis [Tr. 292-293].

Dr. Krueger's assessment of Martinez's cognitive functioning, particularly taking into account the results of the Working Memory Index text, is more restrictive than the earlier assessments by other providers.  Dr. Krueger found problems with concentration and memory, mild to moderate impairment of understanding, remembering and following simple instructions, "perhaps" moderate to severe impairment with complex or detailed instructions, and moderate impairment with pace and persistence in many work environments. [Tr. 267].

As the district court pointed out in Stephens v. Callahan, review of an ALJ's decision when new evidence is submitted to the Appeals Council "will necessarily involve some degree of speculation as to how the ALJ would have weighed these records had they been available for the original hearing."  971 F. Supp. at 1390-91.  The test is whether the new evidence provides a basis for changing the ALJ's decision.  Id., at 1390.

The Court finds that Dr. Krueger's report, while differing to some extent from prior evaluations, does not fatally undermine the sufficiency of the evidence supporting the ALJ's decision, when the record is viewed as a whole.

Dr. Krueger made a diagnosis of PTSD.  However, this finding was based on descriptions by Martinez of traumatic incidents in the military and in his later law enforcement career, incidents which Martinez never mentioned to any other mental health care provider.  In addition, Dr. Krueger was under the impression that a large portion of Martinez's VA disability rating was combat-related, but other record evidence shows that he was never involved in combat.

The ALJ made a credibility finding, which Martinez does not challenge, that "the claimant's statement concerning the intensity, persistence and limiting effects of these symptoms [arising from medically determinable impairments] are not entirely credible." [Tr. 28].  Given that finding, and the fact that Martinez was not consistent in describing past traumatic experiences to medical care providers other than Dr. Krueger, the ALJ's decision is not undermined by Dr. Krueger's finding of PTSD.  And, while another examiner, Dr. Gzaskow, noted PTSD as one of his findings, he qualified this when he added "by history."  He did not discuss or analyze PTSD in his report.

In any event, as Claimant points out in his briefing, "[t]he bottom line is not, however, whether the Plaintiff suffers from PTSD or not.  Rather, the issue is the degree of functional impairment caused by any diagnosed condition." [Doc. 10, at 8].  Dr. Krueger conducted psychological tests, which the other providers did not, and found that Martinez suffers from memory problems.  There is other evidence in the record of some memory deficits, including Martinez's own statements and the letters from his wife and brother, and the finding by all providers that he suffers from some depression and social withdrawal.  However, the record as a whole, even with Dr. Krueger's report, supports the ALJ's finding that Martinez is capable of "understanding, remembering and carrying out moderately detailed instructions and tasks in object-focused work that is relatively routine in nature." [Tr. 25].

No other mental health examiner found marked memory deficits.  Martinez is active in his

church and with the color guard.  He manages his own finances and those of his elderly father.  All

of these factors support the ALJ's finding as to Martinez's capabilities in the areas of memory,

understanding and carrying out tasks.  While Dr. Krueger's findings regarding memory problems

are relevant and must be taken into account, the Court cannot say that his report would have changed

the end result, had it been part of the record at the time the ALJ rendered her decision.  This Court

cannot re-weigh evidence or make factual findings but is limited to determining whether the ALJ's

conclusions are supported by substantial evidence on the record as a whole.  The Court finds that

the decision is so supported.

### *Claimant's Point II:*
#### *Whether the ALJ Properly Considered*
#### *Claimant's VA Disability Rating*

As noted above, Martinez is rated 100% disabled by the VA.  While disability determinations

by other agencies are not binding on the Social Security Administration, 20 C.F.R. § 404.1504

(2008), such determinations are nevertheless entitled to weight and must be considered.  Baca v.

Dept. of Health and Human Servs., 5 F.3d 476, 480 (10th Cir. 1993).  In addition, "the adjudicator

should explain the consideration given to these decisions in the notice of decision . . . ."  SSR 06-

03p.

Martinez challenges the manner in which the ALJ considered the VA disability rating

evidence, contending the ALJ committed error by relying on a report of the U.S. Government

Accountability Office ("GAO") entitled, "Veterans' Disability Benefits: VA Should Improve its

Management of Individual Unemployability Benefits by Strengthening Criteria, Guidance, and

Procedures," GAO-06-309, 2 (Washington, D.C.: May 30, 2006).

The ALJ quoted from the GAO report, which noted that, while VA rating specialists are

required to consider medical information when making decisions on "individual unemployability"

claimants, there are no procedures for making vocational assessments for such claimants. The ALJ pointed out that "this is a major difference in 'disability' under VA determinations and 'disability' under SSA determinations." [Tr. 27]. This comparison was in keeping with the ALJ's responsibilities as set forth in 20 C.F.R. § 404.1504 (2008):

> A decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind. **We must make a disability or blindness determination based on social security law.** Therefore, a determination made by another agency that you are disabled or blind is not binding on us. [Emphasis added].

It was not error to point out the differences in decision-making at the VA as compared with the Social Security Administration. Martinez faults the ALJ for "completely ignoring" the VA determination because she disagreed with the methodology of VA disability determinations in general, rather than considering the individual circumstances of Martinez's case. This, he argues, indicates unfair bias against veterans.

The ALJ did not "ignore" the VA determination. Rather, in the section of her decision dealing with RFC, the ALJ gave detailed reasons for rejecting the VA's assessment of 100% disability. First, she found the timing of Martinez's resignation from his job as a deputy sheriff to be suspect. She noted that Martinez received a combined disability rating of 70% as of August 10, 2004 and then resigned from his job 17 days later. On September 15, 2004, five days after the effective date of his resignation, he filed a claim with the VA for an increased percentage rating, citing "individual unemployability," and the VA granted Martinez a 100% service-connected evaluation, based on individual unemployability, beginning the effective date of his resignation. [Tr. 27].

The ALJ further noted that Martinez testified at the hearing that he left his job at the sheriff's

department because of his mental condition, in particular the fact that he was required to carry a gun. The ALJ noted that the evidence considered by the VA rating specialist in Martinez's case did not include a vocational assessment, and concluded: "even if claimant should not carry a weapon, it hardly forms the basis for 'individual unemployability.'  I have considered the medical *and* vocational issues in the present case, and do not consider claimant unemployable." [Tr. 27; emphasis in original].

The Court finds that the ALJ properly considered the individual circumstances surrounding the VA's disability rating of Martinez and noted her disagreement with that rating, clearly stating the reasons therefor.  While the GAO report deals with the VA's general procedures in making disability ratings, the ALJ relied primarily on the fact that  there was no vocational assessment in Martinez's VA records, rather than on the general procedures of the agency.

In addition, the ALJ found that the timing of Martinez's resignation was "contrived" and represented an attempt to bootstrap a claim of individual unemployability to his 70% disability rating so that the VA would consider him to be 100% disabled.  As the Commissioner points out, an ALJ may validly make inferences of this sort from the record.  It matters not whether the Court would have made the same inference; in the case, the inference made was not an unreasonable one and finds support in the record.  "In our view, the evidence is such as to permit varying inferences. The ALJ came to grips with the problem, and, on such state of the record, for us to disturb his finding would simply put us into the fact-finding business. This we should not do."   Tillery v. Schweiker, 713 F.2d 601, 603 (10th Cir. 1983).

Martinez also faults the GAO report as hearsay.  Even if it were hearsay, the rules of evidence applicable to court procedures are not binding in Social Security hearings, and hearsay evidence is not *per se* inadmissible in such hearings.  42 U.S.C. § 405(b)(1); Trujillo v. Richardson,

26

429 F.2d 1149, 1152 (10th Cir. 1970).

***Claimant's Point IV:***
*Whether the ALJ Properly Considered*
*the Statements of Claimant's Wife and Brother*

Martinez contends that the ALJ erred by failing to give appropriate weight to the letters written by his wife and brother which discuss his social withdrawal and problems with concentration and memory. Martinez points out that Dr. Gzaskow, the psychiatrist providing a consultative report, found the letters to be "excellent data." [Tr. 219].

As noted above, on May 20, 2004, Martinez's wife Teresa wrote that he is often fatigued, doesn't associate with family and friends as much as he used to, becomes angry over small things and that "[s]ometimes someone who knows him may approach him, but he cannot remember who this person is. I feel my husband may have some memory loss, which may have resulted from his depression." [Tr. 86]. She wrote another letter on November 14, 2006, which focuses primarily on Martinez's physical health concerns but in which she again notes his depression, social isolation and her belief that he also "experience[s] some memory loss." [Tr. 127]. Martinez's brother Domingo stated in his letter that Martinez had become socially isolated and "has memory lapses and many times does not remember old friends, relatives, dates and events in our past." [Tr. 85].

The ALJ found that Martinez has moderate difficulties in the area of social functioning, and mild difficulties in concentration, persistence and pace. In discussing the basis for these findings, the ALJ referred to Martinez's own statements and the information in the letters from Teresa and Domingo Martinez, and balanced that information against the fact that Martinez rarely sought mental health treatment and that his assertions of social withdrawal are undermined by evidence of participation in Vietnam Veterans' activities and frequent church attendance. [Tr. 24]. In addition, she noted that neither Dr. Gzaskow nor Ms. Greene's mental status examinations showed any

difficulties with concentration or memory.  The ALJ commented that she accorded little weight to the family members' letters "[i]n light of their natural bias and lack of credentials," as compared with the findings of the medical care providers.  [Tr. 24].

An ALJ is required to consider all evidence of record.  This may include lay statements from people who know the claimant, such as spouses and siblings.  20 C.F.R. §§ 404.1512(b)(3), 404.1513(d)(4) (2008).

> Information from these 'other sources' cannot establish the existence of a medically determinable impairment.  Instead, there must be evidence from an 'acceptable medical source' for this purpose.  However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairments(s) and how it affects the individual's ability to function.

SSR 06-03p, 2006 WL 2329939, at *2.

However, the ALJ is not required to give such evidence controlling weight.  "The weight to which such evidence may be entitled will vary according to the particular facts of the case, the source of the opinion, including that source's qualifications, the issues(s) that the opinion is about, and many other factors . . . ."  Id., at *4.  Some of these factors include the nature and extent of the relationship, whether the evidence is consistent with other evidence on the record, and whether the source has a specialty or area of expertise related to the individual's impairments.  Id., at *4-5, 6.

One district court has held that the ALJ is not required to articulate reasons for rejecting lay opinion in favor of professional medical opinion.  Patrick v. Astrue, No. 07-161-JBC, 2008 WL 3914921, at *3 (E.D. Ky. 2008):

> This regulation, 20 C.F.R. § 404.1513(d)(4), merely states that the ALJ may use evidence from '[o]ther non-medical sources (for example, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy)' to determine the severity of the impairment . . . .  However, . . . the regulation does not indicate

28

that the ALJ must state in his decision what credibility and weight he
gave to Plaintiff's wife's statements.

In this case, the ALJ did explain her reasoning. She stated that she was not according great weight to the family members' letters, as compared with the reports of medical professionals, because of the family members' "natural bias" and lack of credentials. This was appropriate; it demonstrates that the ALJ weighed the evidence and balanced it in light of other record evidence, and assessed the credibility of the source. The ALJ made a finding that the lay statements were not consistent with, and did not outweigh, the medical professional's opinions, and the Court finds this determination to be supported by substantial evidence.

### *Claimant's Point V:*
*Whether the ALJ's RFC Finding*
*is Supported by the Evidence*

As noted above, Martinez concedes that his physical problems are not by themselves disabling, but rather it is his psychological reaction to his physical problems, along with PTSD, which qualifies him for Social Security disability benefits. The ALJ thought otherwise and found that Martinez's mental impairments would not prevent him from doing his past relevant work as a supply clerk, making the finding that Martinez has the RFC to perform the full range of light work and "is capable of understanding, remembering and carrying out moderately detailed instructions and tasks in object-focused work that is relatively routine in nature." [Tr. 25].

Martinez argues that this finding is unsupported by the evidence, in that Dr. Gzaskow (the consulting psychiatrist) and Dr. Gabaldon (a non-examining DDS physician) placed more restrictive limitations on Martinez's capacity for concentration, persistence and pace, and that Dr. Krueger's later report confirmed these higher limits.

Dr. Gzaskow reported that Martinez "can understand and follow directions in a

structured/supportive environment and can attend to simple tasks." [Tr. 222]. Dr. Gabaldon, who did not examine Martinez, found moderate difficulty in maintaining concentration, persistence or pace, moderate limits in Martinez's ability to maintain attention and concentration for extended periods, and mild limits in his social functioning. [Tr. 233, 237]. However, he also found that Martinez was not significantly limited in his ability to remember locations and work-like procedures, or in his ability to understand and remember detailed instructions. [Tr. 237, 239].

The ALJ found that Martinez has moderate difficulties in social functioning, rejecting Dr. Gabaldon's opinion of mild difficulties. She based this finding on the fact that, on the rare occasions when Martinez sought mental health treatment, his main complaint was in the area of social functioning. She also noted Teresa and Domingo Martinez's statements regarding social isolation and withdrawal. [Tr. 24].

On the other hand, the ALJ rejected Dr. Gzaskow's assessment of moderate difficulties in the areas of concentration, persistence and pace, finding that the record evidence supported only mild difficulties in this area. The ALJ pointed out that although Dr. Gzaskow concluded that Martinez could "understand and follow directions in a structured/supportive environment" and "can attend to simple tasks," the doctor did not find any difficulties with concentration or memory when he administered the mental status exam, a finding consistent with the mental status exam finding by Ms. Greene. [Tr. 24].

As noted, the full extent of Martinez's actual treatment for psychological problems consists of two therapy sessions with social worker Teresa Graber; thus, she is his only treating mental health care provider. Ms. Graber noted the following, in describing Martinez's statement of his problems and the reason for his first visit on June 1, 2004:

Vet reports that he is stressed by his health problems, has DM II

30

> [diabetes mellitus type II] with some difficulty controlling and spinal problems, neck and lower back, with bulging disk. Since the holidays he's been experiencing some related symptoms of depression, anxiety, including depressed mood, mid-nite awakendings [sic], preoccupation with health, irritability, isolation, decrease in interests, impaired motivation, ability to complete tasks.

[Tr. 164]. By the second and final session on June 21, 2004, Martinez reported a decrease in symptoms, which he attributed to the initial session with Ms. Graber, his continuing efforts to control his diabetes, exercise, and attending church frequently for support. His primary complaint was "processing around resentments toward Govt. re: his benefits, retirement and SC [service connection]." [Tr. 163]. Although at the first visit Ms. Graber had considered a trial of antidepressant medication, by the second session she noted that medication may not be necessary.

In neither of these sessions did Martinez complain about memory lapses. With respect to impairment in his abilities to concentrate and maintain persistence and pace, his only complaint was that his motivation and ability to complete tasks had decreased. This evidence is consistent with the ALJ's finding that Martinez suffers only mild difficulty in the areas of concentration, persistence and pace. The ALJ adequately explained the reasons for this finding, and it is consistent with the record evidence.

While Dr. Krueger's mental RFC assessment, submitted after the ALJ decision, found a greater limitation than that described by the ALJ [Tr. 268-269], the Court finds, for the reasons given above, that his report does not fatally undermine the ALJ's decision.

## Conclusion

The Court rejects each of Martinez's claims of error, for the reasons stated above. The ALJ's opinion is supported by substantial evidence, and the Commissioner applied the correct legal standards in its handling of the case.

31

## **Order**

IT IS THEREFORE ORDERED that Plaintiff's Motion to Reverse or Remand [Doc. 10] is

denied, and this case is dismissed with prejudice.


*Lorenzo F. Garcia*
Lorenzo F. Garcia
Chief United States Magistrate Judge